1  SHAHROOZ C. TABIBNIA (Cal. Bar No. 237348)
   Tabibnia Law Firm
2         10100 Santa Monica Boulevard
3         Los Angeles, California 90067
          Telephone: (818) 714-2228
4         Facsimile: (818) 714-2366
          E-mail: cyrus@tabibnialaw.com
5
6  Attorney for Defendant
7  JAMES DAVOLT

8                    UNITED STATES DISTRICT COURT
9
10          FOR THE CENTRAL DISTRICT OF CALIFORNIA
11

| UNITED STATES OF AMERICA, | No. CR 19-515-VAP |
|---|---|
| Plaintiff, | Hon. Judge Virginia A. Phillips |
| v. | **SENTENCING MEMORANDUM ON BEHALF OF JAMES DAVOLT** |
| JAMES DAVOLT, | Date: August 16, 2021 |
| Defendant. | Time: 9:00 a.m. Courtroom: 8 |

TO THE ABOVE TITLED COURT, THE UNITED STATES OF

AMERICA AND ITS ATTORNEYS OF RECORD:

        Please take notice that Defendant James Davolt, by and through his counsel

of record, Shahrooz C. Tabibnia, submits his position concerning sentencing. The

defense reserves the right to supplement this memorandum with additional points

and authorities, including new claims, in response to any filings by the State, and on

the record at the time of sentencing, currently set for August 16, 2021.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  July 17, 2021                          TABIBNIA LAW FIRM


                                    By:    /s/ *Shahrooz C. Tabibnia*
                                           Shahrooz C. Tabibnia
                                           Attorney for Defendant
                                           James Davolt

# __INTRODUCTION__

## I.      __FACTUAL BACKGROUND__

The underlying crime in this case arose as a result of the sad confluence of preexisting trauma, physical illness and unusual life stressors. During intermittent pockets of time between 2013 and 2015, James Davolt, grappling with numerous personal challenges, engaged in act of obtaining and sending child pornography online.

It may never be possible, perhaps not even for James, to fully comprehend the root causes of what lead him to transgress this final barrier, regressing from a perfectly lawful (if unhealthy) interest in adult pornography to increasingly risqué adult filmography and then ultimately, to the conduct for which he now stands before this court. What is clear, however, is that James is not a pedophile, nor is he a threat to the community. His behavior, while condemnable, arose out of a psychological predilection to divert from his painful life existence. In this, he was not driven by any personal sexual interest or attraction to children.

James' background never suggested he would be here. Certainly, his childhood had its share of its traumas; James' father abandoned him early on and he was repeatedly sexually molested when you he was a little boy.

Yet, despite these challenges, James grew up to be a responsible, conscientious and respectable man. He served his country with distinction in the

United States Army. He donated thousands of hours of his time volunteering for important social causes. He gave back to his community. He served as the sole caretaker for his elderly and sick parents.

Relentlessly hardworking and never afraid of facing challenges, James was often seeking to improve himself and help those around him. He pursued his education. He served his country abroad and trained with the United States Special Forces and Navy Seals. He sought to learn about other people and cultures, spending time in Asia studying and obtaining black belts in karate, jujitsu and the Filipino martial arts. Throughout his adult life, he has always been employed, taking on job positions and a career from which most would shrink. For the last 20 years – and until his arrest in this case – James worked as a psychiatric technician at Atascadero Hospital, a forensic psychiatric facility for the criminal insane, whose patient population is involuntarily remanded for treatment by county superior courts or by the Department of Corrections and Rehabilitation (CDCR).

James chose that career, in part, due to his lifelong and persistent interest in serving those in need of care. But idealism only goes so far, and James' work at Atascadero Hospital was often quite harsh, even traumatizing. He was routinely the victim of verbal and physical abuse by the inmates there. He was often cursed, mocked for his weight, his stuttering and other idiosyncrasies. Patient/inmates spat on him, and often had feces, blood and urine thrown him. Worse, work at Atascadero Hospital could be dangerous; he received numerous threats and was

4

violently assaulted on several occasions. One patient, who was soon set to be released, told James that he knew where he lived and would kill him once he got out.

The most harrowing assault occurred in December 2012. Suddenly and without warning, a patient he was caring for attacked, beat and repeatedly kicked James in the head, leaving him unconscious, concussed and hospitalized. He suffered a traumatic brain injury and required 3 months away from work. At the urging of his employer and his own stubborn tendency to press ahead through difficulties, James returned to work. Soon, and due to the hospital's needs, he was back and working 64-80 hours a week in that same environment. And he continued to volunteer his time teaching self-improvement courses to the patients at Atascadero, including classes sex addiction, child sex abuse, mental health well-being, hygiene, anger management, substance abuse, barriers to discharge and others.

Still, James did not seem to be himself after the incident. Psychologically, he began experiencing increasing nightmares, panic attacks, uncontrolled weeping, rage, anxiety and deepening depression. He would often wake up in the middle of the night, in a sweat, screaming. He was later diagnosed with Post Traumatic Stress Disorder (PTSD), severe depression and anxiety. Physically, James began experiencing bouts of vertigo, memory loss and confusion. For the first time since his army days, he began drinking heavily again. With hindsight, James was in

desperate need of psychological therapy; he had experienced traumatic abuse as a child, had been working at a distressing job position, had just been brutally assaulted and was contending with severe health conditions. That he did not seek any therapy was one of the biggest mistakes of his life. But it was indicative; both of the loneliness of a life wherein he did not have anyone who could encourage him to take these measures and of a stubborn character that often sought to ignore his anguish and simply push ahead.

Obviously, it is difficult – 9 years after the fact – to draw a correlative connection between these life issues, a horrendous assault and a child pornography offense. But it bears consideration that the assault – and the traumatic injury to James' brain – took place in December 2012; James' engagement with child pornography is alleged to have commenced in early to mid-2013. Certainly, there are other factors that explain the increasing emotional turmoil and increasingly odd behavior James began experiencing after the attack. Conceivably, working around mentally ill and violent inmates for many years could have been a contributing factor. Or perhaps it was a culmination of years of avoiding the trauma of his childhood. His many serious medical conditions did not help: years of humiliating sexual impotency, diabetes, thyroid cancer, the constant headaches, and persistent fatigue and dizziness that would later be diagnosed as a serious heart condition. When James' fiancé informed him in 2013 that she wanted to postpone their marriage for another year to think things through, James' despondency may have

gotten the best of him. As stated, James, a disciplined man who never indulged in drugs, began drinking heavily again for the first time in 25 years. None of this is an excuse, of course, but rather an explication of a phenomenon; that phenomenon being a man with no criminal history engaging in inexcusable conduct just when he was contending with an enormous confluence of personal distress.

But what is clear is that beginning in 2013, James began spending increasing amounts of his late nights on the internet, watching adult pornography. Often, he was inebriated. As time went on, he came onto more and more risqué adult films online. Ultimately, James was lead to online child pornography. Shamefully, he received and even sent child pornography. While chatting online, he is also alleged to have sent bizarre, drunken chat messages claiming to have had sex with many children in the Philippines ho were 5, 6, 7, and up. And other messages requesting that a recipient show her young daughter nude (neither party followed up on this request). These statements were as inexcusable as they were ludicrous; James has been sexually impotent for many years and child prostitutes under the age of 13 in the Philippines are unheard of.

What is equally clear is that James has no personal sexual interest in children. Psychological experts who examined him concluded that James is not a pedophile; he has no sexual interest in children. He himself has counseled numerous sex offenders at Atascadero on child sex abuse. In reality, his examinations revealed that, during the period of time in question, James was a traumatized, overwhelmed

and deeply lonely man who was in a tremendous amount of pain and distress. His online activity, while abhorrent, was a form of acting out and distracting himself from his painful reality; it was not indicative of any sexual interest in children. In this regard, James is in need of therapy far more than he is deserving of punishment for this non-violent crime.

## II.   CASE PROCEDURAL HISTORY

On September 3, 2015, a search warrant was executed at the James' residence. During the search, officers from the Federal Bureau of Investigation (F.B.I.) advised James that he was not under arrest, and could leave at any time while the search was being undertaken. James facilitated this process by volunteering a search of his vehicle and other items. He also granted the agent's request for an interview.

While initially reluctant, the James admitted to the agents that he possessed, had received and viewed child pornography on his computer. He also admitted that the two email accounts under investigation belonged to him. He also admitted certain statements in online chats were made by him.

James was arrested and arraigned on September 11, 2019 – four and half years after the search – and  charged in a seven-count indictment with three counts of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A)(b)(1); two counts of distribution of child pornography in violation of §18 U.S.C. § 2252A(a)(2)(A)(b)(1); and two counts of possession of child pornography in

violation of §18 U.S.C. § 2252A(a)(5)(b)(2). He was released on $50,000 bond and placed on electronic monitoring for the duration of the case. On June 4, 2021, James entered a plea to one count of receipt of child pornography and one count of distribution of child pornography.

## RELEVANT FACTS

## I.   JAMES' PERSONAL BACKGROUND

> "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be in the moment of his sentencing, when his very future hangs in the balance." – Judge Jed Rakoff.

It is important to begin with what has often been lost in the caricatures often depicted of persons convicted of crimes against children: James Davolt is a person of humble beginnings, who transcended a difficult childhood, trauma and illness to build a respectable and productive life.

### A.   A Traumatic Childhood

James was born in Atascadero, California. As stated, he was abandoned by his father when he was a little boy. Further, James experienced extensive sexual abuse during his childhood by no less than seven (7) persons. See, Exhibit 1, Malinek, Hy, *Comprehensive Psychological and Risk Assessment Report* (hereinafter, "*Malinek Report*") (2021), at p. 10; Exhibit 2, *Probation Sentencing Report* (hereinafter, "*PIR Report*") (2021) at pp. 12-13, ¶¶ 69-74.

Courts have treated childhood sexual abuse as a significant mitigating factor

in possession of child pornography cases.  See e.g., *United States v. Pelloski*, 31

F.Supp.3d 952, 961 (S.D. Ohio 2014) (defendant sentenced to twelve months and

one day imprisonment); *United States v. Prisel*, 316 Fed. Appx. 377, 2008 WL

4899451 (6th Cir. 2008) (unpublished) (sentence of one day of imprisonment, three

years of supervised release, including 18 months of home confinement with

electronic monitoring was reasonable).

Childhood sexual abuse is often traumatic, hinders normal social growth, and

can be the cause of many different psychosocial problems. Hall, M. and Hall, J.,

(2011), *The long-term effects of childhood sexual abuse: Counseling implications*.[1]

"Childhood sexual abuse has been correlated with higher levels of depression, guilt,

shame, self-blame, eating disorders, somatic concerns, anxiety, dissociative

patterns, repression, denial, sexual problems, and relationship problems." *Id*. at 2.

Survivors of abuse often have "difficulty in externalizing the abuse," and therefore

think negatively about themselves, have feelings of worthlessness, and avoid others

believing they have nothing to offer. *Id*.

As a child, James suffered extensive sexual abuse. It is the defense's

contention that treating the trauma inflicted by the sexual abuse will have a more

positive effect on James than would a lengthy prison sentence.

---

[1] https://www.counseling.org/docs/disaster-and-trauma_sexual-abuse/long-term-effects-of-childhood-sexual-abuse.pdf (last accessed July 21, 2021).

**B.      James' Long, Respectable History of Employment**

As expounded upon above, at the time of his arrest, James was working as a psychiatric technician at Atascadero State Hospital, a forensic facility for the criminally insane, where he had been employed for approximately 20 years. At Atascadero, he was in charge of staff and oversaw patients/inmates, most of whom retained serious and violent criminal records. Job evaluations of James attests to his ability to work well with others, his demonstrated leadership, great time management skills and his attention to detail. His evaluations also describe James as pleasant with patients, a leader to his co-workers, good-natured, competent and possessing a positive attitude. *PIR Report* at p. 15, l. 97.

James recounts that the position was unusually intense and stressful and sometimes dangerous. At Atascadero, James suffered threats to his safety, and was routinely the victim of verbal and even physical abuse. Most seriously, he suffered a traumatic brain injury in 2012 which left him hospitalized. He was also assaulted in 2017, which lead to torn ligaments in his knee. James' positive work history should be factored in for the purposes of sentencing.

**C.      James' Extensive and Admirable Record of Volunteerism and Public Service**

1.      Military Service

James served in the United States Army from 1986-1991. He was also stationed in Germany – as a combat engineer – but was also deployed to Panama

during the 1989-90 U.S. invasion. He also served during Desert Storm but was not deployed to Iraq. James received a number of achievement and good conduct medals. He was discharged from the Army under honorable conditions. *PIR Report* at p. 15, l. 103.

### 2.    Volunteerism with youth offenders

James likewise retains an extensive record of volunteerism and community service. From 1993-1998, he worked as a volunteer counselor at the California Youth Authority ("CYA", now called the Division of Juvenile Justice), an organization established in 1943 as a reform school for young criminal offenders. James volunteered about 15-20 hours a week for five years, donating over 4,000 hours of his time to the CYA. He states that perhaps no one person in the CYA's history volunteered more of their time to the organization. While there, James was entrusted with the supervision and counseling of young men on a number of issues pertaining to rehabilitation, and rejoining and becoming productive members of society, subjects which give him particular satisfaction. *PIR Report*, p. 15, l. 102.

### 3.    Volunteer work as City Patrolman

From 1996 to 1998, James donated a good deal of his time at the Paso Robles Police Department, working as a voluntary patrolman for the city. *PIR Report* p. 15, l. 101.

### 4.    Courses Taught at Atascadero Hospital

James taught or assisted in teaching over 100 courses to patients/inmates at

Atascadero Hospital. Many of these were taught by James on a volunteer basis. These classes were generally concerned with self-improvement and aiding inmates in their attempts to rejoin society. The subject of these classes included sex addiction, child sex abuse, mental health well-being, hygiene, anger management, substance abuse, barriers to discharge and others. He also taught a guitar course to inmates. *PIR Report*, p. 15, l. 98.

### 5.   Volunteer work as an Ordained Minister

James is ordained as a nondenominational minister. In that capacity, he has volunteered his time presiding over marriage ceremonies, baptismals, and funerals. He has largely undertaken these endeavors on behalf of those with limited means.

### 6.   Sole Caretake of his Elderly Parents Provider

For many years, James has been the sole care provider for his mother (age 74) and stepfather (age 89). Both suffer from a number of ailments. Likewise, James' 36 year old, immigrant wife has no family in the United States and is dependent upon him for a number of things. She works as a nurse and caretaker.

## D.   James' Medical Conditions and Procedures

### 1.   Diabetes

James was diagnosed with diabetes in 2008 and takes medication for the condition. *PIR Report*, at p. 14, l. 84.

### 2.   Atrial Fibrillation

James was diagnosed with atrial fibrillation, a serious condition wherein his

13

heart functions at approximately 30% of capacity. He was diagnosed in 2015 and consumes medication for the ailment; but has likely been suffering from the condition for much longer in light of the symptoms associated with the same (fatigue, dizziness, shortness of breath, etc.) Ex. 2, *PIR Report*, at p. 14, l. 86.

### 3. Thyroid Cancer

James was diagnosed with thyroid cancer in 2007 and had a thyroidectomy (partial removal of the thyroid gland) undertaken thereafter. His cancer is in remission but is still present in his body. He consumes daily medication. Ex. 2, *PIR Report*, p. 13, l. 84.

### 4. Sexual Impotency

James was diagnosed with low testosterone and sexual impotency in 2007. Ex. 3, *Central Coast Endocrinology* Medical Record. But he believes that he has been suffering from the condition since before 2000.

### 5. Hypertension

James was diagnosed with hypertension (high blood pressure) in 2016. He has twice been treated with cardiac ablation in order to control his blood pressure. *PIR Report*, at p. 14, l. 87.

### 6. Cardiac ablations

James had cardiac ablations undertaken in 2018 and 2020. *PIR Report*, at p. 14, l. 88.

### 7. Vertigo and Memory Loss

James has suffered from vertigo and memory loss for a several years. *PIR Report*, at p. 14, l. 85.

### 8. Psychological Conditions

Psychologically, James has been diagnosed with PTSD, severe depression and anxiety. Ex. 4, Russell, Peter R., *Neuropsychological Evaluation of James Davolt.*

## II.   OFFENSE CONDUCT

In addition to his regular work there, at Atascadero Hospital James sometimes taught courses to inmates on child sex abuse, sex addiction, and mental health that he himself is now being convicted in a child pornography case is a source of deep embarrassment and shame for James. He has always prided himself as a man of discipline who overcomes his obstacles and cares for the weak and indigent. This is partly exhibited by his extensive volunteer work. That his actions here not only harmed himself, but also perpetuated the exploitation of children is an emotional burden which he has had to carry and which weighs on him constantly. Not least, that people could ever suspect that he would ever personally harm a child often overwhelms him with pain and despondency.

### A.   James' Involvement in Child Pornography

The evidence in this case indicates that James' involvement with child pornography commenced in 2013 and ended in 2015. As stated above, during this

period, James initially became increasingly involved with various forms of (legal) adult pornography and, later, child pornography. He has plead to retaining approximately 700 images and 200 videos.

### B.     Mitigating Factors

#### 1.     James' compelling personal history should be considered

James has no history of criminal conduct. He was born into limited means and suffered a traumatic childhood. Nevertheless, he educated himself and made something of his life.

Moreover, as denoted above, he retains an extensive, long and admirable history of significant volunteerism and public service. Said good works have not been merely of the occasional, weekend community service variety (though respectable in its own right). Rather, throughout his life, James has consistently exhibited selflessness, idealism and even courage by donating significant quantities of his time to serious matters. He honorably served his country in the United States military. Thereafter, he donated 5 years of his prime working years volunteering thousands of hours of his time counseling at risk and incarcerated youth offenders on becoming productive members of society. As one may imagine, this was not an easy environment; James often faced angry, hostile young men. He was often verbally abused, ignored or insulted. But James continued with his work, undeterred.

Later, James again donated large blocks of his time volunteering for the local

Paso Robles Police Department as a patrolman. And as discussed above, during his 20 years of employment at Atascadero Hospital, James donated significant time as an instructor in self-improvement courses to the patient/inmates at the hospital. Nor did his position at Atascadero merely constitute a means to a paycheck. Certainly, he could have chosen a less demanding career. But at Atascadero, James felt that he was doing meaningful work and making a difference in people's lives.

Today, as his body has increasingly broken down by age and disease, James devotes a modest amount of his time volunteering as an ordained minister at events and ceremonies for persons of limited means.

Indeed, it is not hyperbole to suggest that James rather meager financial savings today – as delineated in the probation report – are at least partially the result of donating significant sums of his time during the prime of his life working without any expectations of recompense.

2. At the time of the incident, James was grappling with severe personal challenges

James should be held responsible for actions he undertook that lead to this case. However, the circumstances leading to these actions – in particular, the confluence of challenges he was facing – should also be factored. As delineated above, James' conduct was indicative of and in reaction to enormous personal stressors with which he was contending at the time. As noted by experts who examined him, James' actions do not reflect any interest in sexual contact with

17

children. Instead, his behavior was indicative of a form of escapism that afflicts certain child pornography offenders, especially those contending with harsh personal realities.

> 3. James online chats are indicative of the escapism underlining his behavior

That James' late night online activity was a form of escapism from stress/trauma – and not indicative of sexual interest in children – is supported by the evidence. Here, both the prosecution and the Probation Report have made an issue of chats Mr. Davolt had online, wherein Mr. Davolt claimed – among other things – that on numerous trips to the Philippines he had engaged in sex with "many" children from ages 5 to 14. These statements were utterly despicable; but they were equally preposterous. James has long been diagnosed with sexual impotence; his official diagnosis was in 2007 but he has suffered from low testosterone, low libido and impotence since at before 2000. In fact, medical literature indicates a correlative relationship between thyroid diseases, diabetes and sexual impotence (all conditions James suffers from). His sexual impotence has likewise been confirmed by his wife during her interview with the FBI and a forensic examiner; she indicated that medication had not helped alleviate his condition. Not least, Mrs. Davolt likewise stated that she had never seen James exhibit any sexual interest in children. *Malinek Report*, p. 8.

Moreover, there is virtually no empirical evidence of the existence of child

prostitutes in the Philippines under the age of 13; studies have observed that child prostitution in the Philippines falls almost exclusively within the 13-17 age range; the vast majority fall within the 15-17 age category.[2] [3]

As such, in light of his sexual impotence, his serious medical ailments and the studies cited above, the premise of James even retaining the physical capability of sex with *anyone*, much less with young children in the Philippines constitutes nothing more than fantastical nonsense. Ex. 5, James Davolt Character Letters. In this regard, James was doing what many do when they feel shielded by the seeming anonymity of the internet: engaging in late night, sometimes drunken escapist conversations, largely to temporarily divert themselves from a painful existence. However inappropriate these chats were, they should not serve as an aggravating factor against James here.

### 4. A low-level consumer

It should be considered that James did not disseminate mass quantities of pornography for profit.  Nor did he distribute pornography to a child to entice the child into engaging in a sexual act. And within the context of child pornography, the number of images he obtained was mild; the number he distributed was quite small. At worst, James was a low-level consumer.

---

[2] Nick M. Arcilla, *The Filipino Children in Prostitution* (2001), at 11.
[3] Christopher A. Bagley, *Adolescent Girls Offered Alternatives to Commercial Sexual Exploitation: A Case Study from the Philippines* (2017), at 4.

5.  Forensic expert's report

As mentioned above, James was examined by noted forensic expert Hy Malinek. His report bears consideration. Ex. 1, *Malinek Report.*

6.  James' involvement with child pornography ended in 2015

During the four year period between when search warrants were executed, in 2015, and when he was arrested, in 2019, James remained a free man; he had access to a cellular telephone and possibly other electronic equipment. Yet, there is no evidence that James ever again attempted to engage in such conduct after 2015. The government may argue that this was due to James knowing that the Government had found him out. But he was not yet arrested in 2015; and there are instances of child pornography offenders who re-offend even after they are caught. A more likely explanation for James' behavior is that recidivism among child pornography offenders is very low; and that James' involvement with such material was over after 2015.

**ARGUMENT**

I.  **THE SENTENCING GUIDELINE CALCULATION, BASED UPON FLAWED  §2G2.2, SHOULD BE GIVEN LITTLE WEIGHT**

This is a case where the Sentencing Guideline range should carry little, if any, weight. The Guidelines ranges employed by the U.S. Sentencing Commission for child pornography-related offenses are not based on empirical evidence, lead to irrational and contradictory outcomes, and should not be accepted without

significant judicial scrutiny. In this case in particular, the Guidelines range leads to an irrational and indefensible result.

### A. Sentences Available and the Advisory Sentencing Range

A conviction under §18 U.S.C. §§ 2252A(a)(2)(A), (b)(1) requires imprisonment of not less than 5 years and not more than twenty years.

### B. The Sentencing Guidelines are One Factor of Consideration

Pursuant to *United States v. Booker*, 125 S. CT. 738 (2005), sentencing guidelines are no longer mandatory; courts must now equally consider other relevant factors not taken into account by the guidelines. Although this Court must still correctly calculate the guideline range, it may not treat that range as mandatory or presumptive. *Gall v. United States*, 552 U.S. 38, 49 (2007) at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, the Court must view the guideline range as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552 U.S. 85, 90 (2007); the Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id*. at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. at 101; *Pepper*, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are trulyadvisory and constitutional, is the authority of this Court to disagree with a guideline as a matterof policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

This Court may thus properly find that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve §3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50. Where the Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role," a district court could reject and vary from the Guideline; it would not be an abuse of discretion for a district court to conclude that the Guidelines

would result in an excessive sentence or one greater than necessary to achieve § 3553(a)'s purposes. *Id*. at 109-110; see also, *Spears v. United States,* 555 U.S. 261, 263-266 (2009) (district courts are entitled to reject and vary categorically from the Guidelines based on a policy disagreement with those Guidelines, even when a particular defendant presents no special mitigating circumstances).

The Court's holdings in *Kimbrough* and *Spears* apply with equal force to other Guidelines, including U.S.S.G. § 2G2.2.  See, *United States v. Henderson*, 649 F.3d 955, 962-963 (9th Cir. 2011) (the child pornography Guidelines are not the result of the Sentencing Commission's characteristic institutional role and district courts may vary from the Guidelines based on policy disagreement with them); *United States v. Dorvee*, 616 F.3d 174, 188 (2nd Cir. 2011) (*Kimbrough*'s holding applies with "full force" to U.S.S.G. § 2G2.2); *United States v. VandeBrake*, 679 F.3d 1030, 1037 (8th Cir. 2012) (district court was free to vary based on a policy disagreement with the antitrust Guidelines); *United States v. Grober*, 624 F.3d 592, 609 (3rd Cir. 2010) (district court adequately explained its policy disagreement with § 2G2.2 and did not abuse its discretion when it varied from the Guidelines range).

Accordingly, this Honorable Court bears the duty and retains the authority to assess the gravity of the defendant's offense relative to others, and contextualize it with its history, characteristics, and punishment goals. In this sense, the defense respectfully asserts that the 151-188 guideline range proposed by both the United States Probation Office (*see* Presentence Investigative Report [*PIR*] p. 23), and the

United States Attorney's Office (*see* Plea Agreement) is excessive and not equitable

under *Gall* as it fails to take into account the 18 U.S.C. § 3553(a) factors.

## C. Guideline §2G2.2 is Flawed and Inconsistent with the Sentencing Commission's Exercise of its Institutional Role.[4]

A significant number of studies, and numerous courts have opined that

guideline §2G2.2 is deeply problematic and the product of seemingly arbitrary

legislation by Congress, rather than the careful research and study of the Sentencing

Commission. Numerous federal judges have joined the chorus of criticism by

condemning the Guidelines and refusing to give them the deference

they typically command. The history of §2G2.2 and empirical studies bear out these

concerns. From 1987 through the passage of the PROTECT Act in 2003, Congress

has steadily and significantly increased the base offense level for § 2G2.2.[5]  United

States Sentencing Commission, *The History of the Child Pornography Guidelines*

(Oct. 2009) (hereafter cited as "U.S.S.C. History of CP")[6]; Troy Stabenow,

*Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of*

*the Child Pornography Guidelines* (unpublished comment, Jan. 1, 2009) (hereafter

---

[4] For cases analyzing the history of the child pornography guidelines and the roles of the Sentencing Commission and Congress, see *United States v. Henderson*, 649 F.3d 955, 960-962 (9th Cir. 2011); *United States v. Grober*, 624 F.3d 592, 604-607 (3rd Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 184-186 (2nd Cir. 2010).

[5] Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. No. 108-21, 117 Stat. 650 (2003).

[6] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf (last accessed July 21, 2021).

cited as "Stabenow").[7] These included significant increases to base levels as well as additions to new enhancements, both of which were often opposed by the Sentencing Commission. U.S.S.C., History of CP at 18-21; Stabenow at 7-8, 20. Some of these enhancements, such as increases to the base offense level and the enhancement for number of images, have no basis in empirical research.  U.S.S.C., History of CP at 42-48; Stabenow at 3, 19-23, 25-26.

Moreover, the significant increase in the base offense level from 13 to 22 is likewise arbitrary and contradictory; whereas, in 1995, the Commission reported that a large portion of pornography offenders had a criminal history involving sexual abuse or exploitation, today's average pornography offender is similar to James – a first time offender, with no history of sexual exploitation (or other criminal activity, for that matter), who has no involvement in the production of pornography. Stabenow at 13-15; Jelani Jefferson Exum, *Making the Punishment Fit the (Computer) Crime: Rebooting Notions of Possession for the Federal Sentencing Of Child Pornography Offenses*, 16 Rich. J.L. & Tech. 8 at 32-33 (2010)[8]. Indeed, recent research observes that the guidelines have become *more* punitive even as the evidence indicates that today's population is *less* dangerous than the population from the early 1990's.[9]

---

[7] http://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf (last accessed July 21, 2021).

[8] http://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1323&context=jolt (last accessed July 21, 2021).

[9] http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-

In light of the above, courts should be especially cautious when determining an appropriate sentence under U.S.S.G. § 2G2.2, because "they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *United States v. Dorvee*, 616 F.3d 174, 188 (2nd Cir. 2010); see also, *United States v. D.M.*, 942 F.Supp.2d 327, 357 (E.D.N.Y. 2013) ("Rationales for child pornography Guidelines for non-production offenses have been shredded").

As noted above, the base level offense under Guideline § 2G2.2 has already been steadily increased over the past 20+ years. Further, §2G2.2 has added a number of enhancements that now apply to virtually every case. These enhancements typically result in a significant increase to the base level offense. This means that an offender with no criminal history in a non-production case – such as James – would face a 15 level increase to the base offense level of 22 – resulting in an unusually harsh sentence guideline range of 151 to 188 months. It should also be noted that prison has a greater significance for those imprisoned for the first time. *U.S. v. Paul,* 329 F.Appx 353 (9th Cir. 2007).

As such, a standard application of § 2G2.2 means that unless a district court grants a downward variance, every offender is treated as the "worst of the worst," irrespective of their true culpability; such a result would directly contradict a court's duty "to consider every convicted person as an individual," and to impose a

_____

meetings/20120215-16/Testimony_15_Wollert_2.pdf (last accessed July 21, 2021).

sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing. *Gall v. United States*, 552 U.S. 38, 52 (2007); 18 U.S.C. § 3553(a).

Indeed, virtually all child pornography cases – including the case at bar – share the following four (4) enhancements: 1) a two-level enhancement for pornographic material involving a minor under age twelve; 2) a four-level enhancement for material portraying sadistic or masochistic conduct or other depictions of violence; 3) a two-level enhancement for use of a computer; and 4) a five-level enhancement for possessing 600 or more images. *Dorvee*, 616 F.3d at 186; *United States v. Grober*, 624 F.3d 592, 607 (3rd Cir. 2010); *United States v. Diaz*, 720 F.Supp.2d 1039, 1041 (E.D. Wisc. 2010).

A consideration of the data compiled by the Sentencing Commission for fiscal years 2010 through 2019 reinforces this point.[10]  The following table shows the frequency of each of the four enhancements expressed as a percentage of the total number of cases in which U.S.S.G. § 2G2.2 was applied:

| Year | Victim Under Age 12 | Sadistic/Violent Images | Use of Computer | 600 images Or more |
|------|------|------|------|------|
| 2010 | 95.6% | 73.6% | 96.2% | 66.9% |
| 2011 | 95.3% | 79.4% | 97.4% | 70.9% |
| 2012 | 96.9% | 80.7% | 96.4% | 76.2% |
| 2013 | 96.1% | 82.8% | 95.3% | 79.0% |

---

[10] http://www.ussc.gov/research/data-reports/guideline (last accessed July 18, 2021)

| 2014 | 95.4% | 83.6% | 94.9% | 78.3% |
| 2015 | 94.5% | 82.6% | 94.4% | 76.1% |
| 2016 | 95.2% | 84.4% | 95.0% | 77.8% |
| 2017 | 94.1% | 71.2% | 95.7% | 74.7% |
| 2018 | 94.1% | 67.1% | 96.6% | 76.7% |
| 2019 | 94.3% | 61.4% | 95.8% | 75.6% |

As the data from the Sentencing Commission reporting clearly signifies, Guideline § 2G2.2 produces ranges that are distorted toward the maximum sentences and that apply to virtually all offenders; essentially, the application of § 2G2.2 often results in sentences that are not proportionate to the crime and do not properly weigh the offender's culpability. Stabenow at 29; *United States v. Tutty*, 612 F.3d 128, 132 (2nd Cir. 2010) (the Guidelines make no distinction between the sentences for an ordinary first offender and the sentences for the most dangerous offenders).

### 1.     The Sentencing Commission's 2012 Report to Congress recommended a comprehensive revision of § 2G2.2.

In light of the contradictions and arbitrary nature of § 2G2.2, in 2012, the Sentencing Commission requested Congress for the authority to undertake a comprehensive revision of the child pornography Guidelines. United States Sentencing Commission, *Federal Child Pornography Offenses* at 322 (Dec. 2012)

(hereafter referred to as "2012 Report to Congress").[11]

In support of its position, the Commission noted that there had been a steady decrease in the rate of within-Guidelines-range sentences for non-production cases from 2004 (83.2 percent) to 2011 (32.7 percent).  *Id*., Executive Summary at ii.  By 2011, 62.8 percent of sentences in non-production cases were below-Guidelines-range sentences.  *Id*., Executive Summary at ii.  From this data, the Commission concluded that "a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.*, Executive Summary at ii.

The Commission further noted that most in the federal criminal justice system had come to conclude that the child pornography Guidelines are outdated and that they were left "without a meaningful baseline from which they can apply sentencing principles" in non-production cases.  *Id*., Executive Summary at iii, quoting *United States v. Stern*, 590 F.Supp.2d 945, 961 (N.D. Ohio 2008).  According to a survey conducted by the Commission, "federal judges believe that many child pornography sentences are too long--71 percent of respondents believed that the mandatory minimum for receipt of child pornography was too high. The same holds true for guideline sentences: 70 percent of the judges surveyed responded that the guideline ranges for possession were too high. Additionally, 69

---

[11] http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last accessed July 21, 2021)

percent believed that sentences for receipt of child pornography were excessive." (U.S. Sentencing Commission, Results of Survey of United States District Judges, January 2010 – March 2010).

The 2012 report specifically acknowledged that many of the §2G2.2 enhancements apply to most offenders and thus do not provide a meaningful way to assess culpability. 2012 Report to Congress, Executive Summary at ii-iii.

### 2. The Sentencing Commission's 2021 Report to Congress reiterated its earlier findings and again pushed for revision of § 2G2.2.

In June 2021, the Sentencing Commission published a subsequent report, intended to update and expand upon its 2012 report on child pornography laws. United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) (hereafter, "2021 Report to Congress"). Noting Congress' failure to act in spite of the recommendations set forth in its 2012 Report, the Commission observed:

> A central theme of the Commission's 2012 *Child Pornography Report* remains true today: the sentencing enhancements in §2G2.2 have not kept pace with technological advancements. Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often depicting the youngest of victims. These factors are already accounted for in §2G2.2 by a series of enhancements that were initially added to target more serious offenses and more culpable offenders. However, the conduct covered by four of the six enhancements—accounting for a combined 13 offense levels—has become so ubiquitous that they now

apply in the vast majority of cases sentenced under §2G2.2.[12]

The 2021 report further notes that "significant aspects of an offender's collecting behavior and aggravating sexual conduct" – such as past or concurrent contact offense are not accounted for in the guideline at all. In short, the guideline "no longer effectively differentiates" in terms of either "the seriousness of the offense or culpability of the offender." As a result, the "inadequacies of the current penalty structure impact the sentencing practices of the courts and the charging practices of the government."[13] For instance, "far fewer non-production child pornography offenders are sentenced within their guideline range under §2G2.2 compared to other federal offenders." As such, Judges have "continued to sentence most non-production child pornography offenders below the guideline range," often by "imposing variances pursuant to their authority under 18 U.S.C. § 3553(a), but also increasingly at the request of the government." These sentences are "increasingly sentencing based on non-guideline factors." Often, "the government limits the sentencing exposure of non-production child pornography offenders by reducing distribution and receipt charges".[14] Whereas possession charges carry no mandatory minimum, receipt/distribution charges retain a minimum 5 year prison term.

---

[12] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf (last accessed July 20, 2021).

[13] *Id.* at 69.

[14] *Id.*

Further analysis revealed significant sentencing disparities remained "not only between similarly situated offenders" such as possession and receipt offenders, but also "among similarly situated possession offenders as a distinct group and similarly situated receipt offenders as a distinct group." Thus, courts are sentencing these offenders, in part, based on factors not accounted for in §2G2.2.[15] As with the possession offenders, "the difference in sentencing outcomes" for "similarly situated receipt offenders" was "considerable." Here, the average sentence for 52 analyzed receipt offenders was 81 months, "with 69.2 percent sentenced below the guideline range." Strikingly, "sentences ranged from 37 months to 180 months" even though "these 52 receipt offenders had the same guideline calculation" by way of the "application of the same specific offense characteristics and criminal history category."[16]

Moreover, distributing child pornography did not lead to more serious charges in many cases. In fact, "offenders sentenced for possession actually distributed child pornography (56.8%) at a rate almost three times higher than those sentenced for receipt (21.2%)." As such, "the decision to charge possession instead of receipt may not always reflect the seriousness of offender conduct with respect to distribution."[17]

3.    **Receipt v. possession: a distinction without a difference**

---

[15] *Id.*
[16] *Id.* at 55
[17] *Id.* at 51.

Whereas simple possession of child pornography does not carry a mandatory minimum for first time offenders, receipt of child pornography does. In reality, everyone who possesses child pornography (except those who produced it) received it in some manner; so the line between possession and receipt is hardly clear. And, because conviction for receipt of child pornography triggers a mandatory minimum and possession does not, prosecutors have vast discretion in what to charge a defendant and, by extension, how to limit a court's sentencing options.[18] According to the U.S. Sentencing Commission, most federal prosecutors interviewed in 13 judicial districts charge defendants with receiving child pornography; the Commission did identify "some inconsistencies in charging practices and plea negotiations relating to child pornography."[19] For example, some prosecutors will drop the receipt charge and forego the mandatory minimum if the defendant agrees to plead guilty to possessing child pornography.[20]

### 4.     Child pornography sentencing: A political hot potato

Child pornography is often seen as a political "hot potato"; any proposed bill seen as "soft" on such offenders will have little chance of passage. The controversy surrounding child pornography will very likely stall any efforts to reform a guideline structure that results in disparate sentencing—an outcome at odds with

---

[18] U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties In The Federal Criminal Justice System 320 (2011) at 298.
[19] *Id*. at 114.
[20] *Id*.

the very purpose of the Guidelines.[21] As Chairman Wilkens noted in his letter, "[o]ne primary reason Congress created the Sentencing Commission was to devise guidelines that avoid these unwarranted variations in sentencing for similar conduct."[22] But, so far, Congress has failed to act; as a result, these unwarranted variations and problematic sentences will continue.

### D.    The Need to Avoid Unwarranted Sentencing Disparities per 18 U.S.C. § 3553(a)(6)

In light of the aforementioned realities, many federal judges question whether § 2G2.2 provides any guidance with regard to imposing reasonable sentences. Hamilton, M., *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?* 22 Stan. L. & Pol'y Rev. 545, 559-569 (2011).  Data collected by the Sentencing Commission indicates that those judges who believe § 2G2.2 does not produce just sentences are in the majority. For instance, in 2016, 1,591 offenders were sentenced under §2G2.2.  2016 Annual Report and Sourcebook of Federal Sentencing Statistics, Table 28.[23] Only 429 individuals received a within guideline range sentence; 713 received a non-government sponsored, below range sentence.[24] Thus, paradoxically, imposition of

---

[21] Stephen L. Bacon, *A Distinction Without a Difference: "Receipt" and "Possession" of Child Pornography and the Double Jeopardy Problem* (2011), at 1036.

[22] 137 CONG. REC. H6736-02 (1991) (letter from Chairman Wilkens).

[23] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2016/Table28.pdf (last accessed on July 26, 2021).

[24] *Id.*

a below guideline range sentence *avoids* sentencing disparity, while a within guideline range sentence promotes disparity.

Certain courts have noted that a below guideline sentence may be required to prevent unwarranted similarities in sentences for dissimilar offenses. *United States v. Cameron*, 2011 WL 890502 at *3-4 (D. Maine 2011). In *Cameron*, the court noted that the prison term for the offense level of child pornography would be greater than if the defendant had actually committed the actual sexual abuse.

## II.     THE §3553(a) FACTORS MERIT CONSIDERABLE LENIENCY IN THIS CASE

The factors the Court must consider under 18 U.S.C. § 3553(a) — in isolation and taken together — demonstrate that a sentence of 151-188 months is far too and not required here; it would result in punishment greater than necessary to achieve the goals of sentencing.

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider the "nature and circumstances of the offense" during sentencing, and pursuant to 18 U.S.C. § 3553(a)(2)(A), a sentence must reflect "the seriousness of the offense."

Possession of child pornography is undoubtedly a serious offense. The children who are sexually exploited for purposes of promoting and producing child pornography suffer significant emotional and physical pain. However, within the context of child pornography, James' conduct falls on the lower spectrum of gravity. That, along with his personal history, merits consideration for significant

leniency and downward departure in this case.

## A. James' Compelling Personal History and Characteristics Warrant Significant Consideration

Pursuant to 18 U.S.C. § 3553(a)(l), the Court must consider the "the history and characteristics of the defendant" during sentencing, including the "mental or emotional condition" of the defendant. *Rita v. United States*, 551 U.S. 334, 364—65 (2007). These factors also counsel leniency in this case.

### 1. James' history of extensive volunteerism and public service

As denoted above, James retains an extensive, long and admirable history of significant volunteerism and public service. He served honorably in the United States Army. He has consistently exhibited idealism and selflessness by volunteering thousands of hours of his time to significant social causes, such as counseling and aiding youth offenders to become responsible and productive members of society or teaching self-improvement courses at Atascadero Hospital.

### 2. James is in poor health

James is 52 years old, but in poor health. He has been diagnosed and daily suffers from several serious medical conditions – including cancer, diabetes, a heart condition, hypertension – each of which are medically known to result in a significant reduction in a person's mortality. He was and remains on a number of powerful medications. These medical conditions do not paint a picture of a man who poses a threat to society. On the other hand, in light of these conditions, a long

prison term will likely prove a death sentence for James.

### 3.    History of childhood abuse

As delineated above, James was a victim of extensive sex abuse when he was a boy.

### 4.    James' conduct came as a result of significant personal stressors, not as any sexual predilection for children

Mental health professionals who have examined James have come to the same essentially conclusion: James is not a pedophile and has no particularized sexual interest in minors that would drive him to commit a crime to satisfy his fantasies. His documented sexual impotency, low testosterone and libido significantly reduces the sexual risk that he poses.

Instead, James' conduct was correlated to the stress, depression and illness from which he was contending at the time of the incident; including a brutal and traumatizing assault which had occurred just months before the behavior commenced. His behavior constituted a form of escapism from a painful existence and not a tendency toward pedophilia. (*Malinek Report*, at pg. 10).

### 5.    Caretaker to his parents

For years, James has been, and continues to be the sole caretaker to his elderly and infirm parents. His incarceration will have significant ramifications for his family.

### 6.    James has already suffered tremendously due to this case

James has already contended with the overwhelming stress of this matter for 6 years. He has been significantly confined and limited by electronic monitoring since November 2019, having had no access to computers or other electronic equipment. This stress has further lead to the deterioration of his health during this case. He is fully cognizant that any significant prison time will lead to further degeneration in his health and – given his many health conditions – very possibly result in his demise in prison. James is also painfully aware that incarceration will likely lead to the rapid decline in the health of his elderly parents, too, considering that he is their sole caretaker, he has no siblings and his parents do not have the financial means for other forms of care . He will have to live with the fact that prison time will mean that he is unlikely to see his sick mother (74 years old) and father (89), ever again.

James will almost assuredly lose his wife, too. She is an immigrant and will have to move back to her country for legal reasons and because, in the absence of James, she will have no family in the United States. James and his wife had dreams of starting a family. His sexual impotency had made that prospect improbable, but he and his wife had considered the possibility of various medical alternatives. Now, even if he were to leave prison alive, his age and worsening health concerns would make a family impossible.

In light of the nature of his conviction, James will likely also face abuse in

prison. And if or when he leaves prison, he will have to contend with the social stigma of his conviction and the legal status of being a registered sex offender.

In short, James' life has been all but destroyed by this case. Certainly, this was all initiated by his own actions. But the court should weigh how much more punishment a person deserves for what is a nonviolent crime.

Per, *U.S. v. Wachowiak*, 296 F.3d 744 (7th Cir. 2006), aside from the instant case, James has exhibited excellent character throughout his life. Exhibit 5.

## B.    Child Pornography Offenders Rarely Engage in Child Molestation

There can be little doubt that part of the rationale for increased child pornography penalties is driven by the concern that child pornography offenders are more likely to commit sexual abuse against children.[25] Yet, there have not been any conclusive studies that demonstrate a causative link between viewing or possessing child pornography and offenses against children.[26] On the contrary, the empirical data suggests a lack of a correlative relationship between child pornography and contact sexual crimes with children. Numerous studies conducted on child pornography, including ones undertaken by Dr. Michael Seto, perhaps the most respected expert on the topic, have concluded that only about 3-4% of child pornography offenders were later charged with a new "contact" offense, including

---

[25] *See, e.g.*, Alexandra Gelber, *A Response to "A Reluctant Rebellion,"* July 1, 2009, at 6, *available at* http://www.justice.gov/criminal/ceos/ReluctantRebellionResponse.pdf.
[26] *See* Melissa Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?*, 22 STANFORD L. & POL'Y REV. 545, 580, 584 (2011).

child molestation.[27] Other research has confirmed that child pornography offenders have very low recidivism rates – lower than "hands-on" offenders and much lower than the average recidivism rate – meaning it is unlikely that they will go on to commit additional offenses.[28]

As such, sentencing child pornography offenders as harshly, or, in many cases, more harshly than those who have actually committed contact offenses against children is neither based in sound evidence nor an effective tool in promoting public safety.[29]

## C.   Recidivism is Very Rare Among Child Pornography Offenders

Moreover, studies show that, in spite of the perception, child pornography recidivism is very rare. One well-known study followed a number of child pornography offenders and found that only 4.6 percent of online offenders had committed a new sexual offense after an average of six (6) years in the community thereafter. Of these, only 4 percent of the offenders were charged with a new

---

[27] Eke, A. W., Seto, M. C., & Williams, J. (2011). *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-Up Study*. Law and Human Behavior, 35, 466-478.

[28] *See, e.g.,* Public Hearing Before the U.S. SENTENCING COMMISSION on Federal Child Pornography Crimes 14 (February 15, 2012) (written testimony of Richard Wollert, Psychology Department, Washington State University Vancouver), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Wollert_2.pdf; Public Hearing Before the U.S. SENTENCING COMMISSION on Federal Child Por-nography Crimes 3 (February 15, 2012) (written testimony of Michael C. Seto, Royal Ottawa Health Care Group) *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Seto.pdf.

[29] *See*, Families Against Mandatory Minimums, *An Introduction to Child Pornography Sentencing*, at 5.

"contact" sexual offense, and just 7 percent of the offenders were charged with a new child pornography offense.[30] A "meta-analysis" reviewing 21 studies and 4,464 online offenders found that just 2.1 percent of offenders were rearrested, recharged or reconvict-ed for a new contact sexual offense and 3.4 percent for a new child pornography offense.[31] Similar results were shown in the United Kingdom. A study by the UK National Probation Service Community Intervention found that – after an average of 13 years in the community following their initial offense – only 2.7 percent of the "hands-off" sex offenders were convicted of a subsequent contact offense.[32] In short, it is very rare for child pornography offenders to re-offend with a sexual offense and even more so for "no-contact" offenders, like James, to do so.

### D. The Nature And Circumstances Of The Offense In This Case Are Less Severe Than Others So Prosecuted

1. <u>James' conduct was not borne out of sexual interest in children</u>

As expounded upon above, James' involvement in child pornography constituted a progression (or regression) from increasingly risqué adult pornography that he was viewing at a time of extreme personal turmoil he had been

---

[30] *Id.*

[31] Public Hearing Before the U.S. SENTENCING COMMISSION on Federal Child Pornography Crimes 3 (February 15, 2012) (written testimony of Michael C. Seto, Royal Ottawa Health Care Group) *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Seto.pdf.

[32] Elliott, Ian (2019). *Long-Term Reconviction Rates For Individuals Convicted Of Indecent Image Offences Appear To Be Low*. Nextgenforensic.

facing. In addition to these stressors, for the first time in years, James had been drinking heavily and was often inebriated during his online activity.

A recent psychological risk assessment analysis of him concluded that James is a "no-contact" or "fantasy" offender. That is, James' conduct was solely as a form of online escapism; he has "not shown any evidence of pedophilic inclination" either "before or in the 6 years that have passed since he was initially detected in this matter." The report concluded that James is not a pedophile. Ex. 3, *Malinek Report*, at pg. 17. This assessment was echoed by Dr. Rick Oliver – the psychologist with whom James has visited through the pretrial federal counseling program – who noted that James does not retain the characteristics of a "classic pedophile." *Id*., at pg. 8. James' conduct, while inexcusable, was due to unusual personal pressures and turmoil he was facing in his life, for which the online behavior constituted a form of escapism; but that does not correlate to an interest in sexual acts with children.

The empirical data and analysis further reinforces the point: it is very rare for child pornography offenders such as James to engage in child molestation or to re-offend with child pornography. James is not a threat to society.

Not least, James' long term sexual impotency and his physical infirmities make him all the more incapable of harming children.

   2. <u>James' behavior is inconsistent with that of a serious offender</u>

First, James' involvement with child pornography occurred during a rather

42

limited time period of about two years: July 2013 through July 2015. But even that is somewhat misleading. The evidence presented by the prosecution suggests that a large portion of the activity charged in this case occurred in or around early to mid-2014. This rather short time frame may be contrasted with child pornography offenders who collect such material over a period spanning many years, sometimes decades. James' conduct, however inexcusable, constituted a very short period of time, in comparison.

Second, studies have shown that certain offenders take a discerning, obsessive interest in child pornography, sometimes organizing and cataloging their collections. The evidence in this case indicates that James did none of that; he obtained random, bulk images, over a relatively short period of time. While not denying his culpability, he has consistently stated that he did not ever even view many of the files.

Third, within the context of child pornography, James did not disseminate a large number of images. According to the 2021 Federal Sentencing of Child Pornography Report, the median number of images distributed by an offender in 2019 was 6,300; many offenders disseminated hundreds of thousands or even millions of images (the most images distributed by an offender in 2019) was 2,478,680.[33] The evidence presented by the government seems to indicate that James distributed 12 images. Further, at least some of the allegations of receipt and

_____

[33] 2021 *Federal Sentencing of Child Pornography: Non-Production Offenses*, at 30.

distribution against James seem to involve images sent (and received) between his own email accounts.

Fourth, James is alleged to have been in possession of total of about 15,000 images (700 photos and 200 videos). Within the context of online child pornography today – wherein a large number of images may be easily sent and received – this is not a large sum. As stated, many offenders collect far more images; for instance, the largest collection of such materials prosecuted in 2019 was just below 3 million images.[34]

Fifth, the prosecution will likely make much of the highly inappropriate content of some of James' online chats. But as argued previously, those chats were drunken escapist absurdities, not rooted in reality.

Sixth, James did not attempt to profit financially or otherwise from his involvement in pornography. At worst, he was a low-level consumer.

### 3. The Government did not consider James a priority for prosecution

The government today argues that James is a threat to society and thus deserving of harsh punishment. But the government's own conduct in pursuing James suggests that he was not considered a priority for arrest and prosecution.

In particular, search warrants on James' email accounts and home were executed in July and September 2015, respectively. The FBI interview of James in

---

[34] *Id.*

September 2015 likewise revealed that the evidence against James was already apparent. Yet, James was not arrested until September 6, 2019, over four (4) years after search warrants were undertaken, pornography on his computer revealed, and James' having admitted that the email accounts being investigated were his. That no charges were filed for four years belies the government's contention that James' is a dangerous threat deserving of harsh punishment.

4.    James has not engaged in illegal conduct since 2015

Moreover, during the four-year period between when search warrants were executed, in 2015, and when he was arrested, in 2019, James remained a free man; he had access to a cellular telephone and possibly other electronic equipment. Yet, there is no evidence that James ever again attempted to engage in illegal conduct after 2015.

The government may argue that James' failure to engage in such activity after 2015 is because he now knew that the FBI had uncovered his past behavior. But there are cases of child pornography offenders who re-offend while their cases are ongoing, before sentencing or even during parole. James, however, has not re-offended. A much more likely explanation for James' behavior is that recidivism among child pornography offenders is very low; like the vast majority of other such offenders who never reoffend, James' involvement with such material was over after 2015. He is, thus, not a threat to society.

1
2
3
4

**E.      The Need for The Sentence Imposed To Reflect The Seriousness Of The Offense, Promote Respect For The Law, And To Provide Just Punishment For The Offense**

5
6
7
8
9

The Court must also impose a sentence "sufficient, but not greater than necessary," to "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)—(C).

10
11
12
13
14
15
16
17
18

The statutory maximum sentence for the offenses in this case are 20 years. Here, the typical increase of 15 levels from a base offense level of 22 for the four enhancements that apply in almost every case means that there is no real distinction between the least culpable and the most culpable offenders.  Under these circumstances, a within-Guidelines sentence cannot promote respect for the law or provide just punishment. As argued above, James is not the "worst of the worst" and to punish him as if he were does not promote respect for the law.

19
20
21
22
23
24
25
26
27
28

On the other hand, a sentence of 60 months in prison will promote respect for the law.  James is already required to register as a sex offender under 42 U.S.C. § 16913 and under applicable state law.  Child pornography will likely be a Tier II offender and will have to register for 25 years. 42 U.S.C. §§ 16911(3)(B)(iii), 16915(a)(2).  The fact that he is a sex offender will be posted on the internet, he will likely experience difficulties in seeking employment and a home, and he will suffer the stigma that the designation incurs. Such are not trivial consequences.  As

46

one court observed: "To be adjudicated guilty necessarily results in denomination as a sex offender; automatically provided is a lifetime of continuous punishment—being marked as a pariah with severe restrictions on residence, movements, activities and associations.  Adding unnecessary, unduly long, periods of incarceration is inappropriate and it should be avoided."  *United States v. R.V.*, 157 F.Supp.3d 207, 210 (E.D.N.Y. 2016).

   1.   <u>There is no evidence that severity of punishment deters child pornography offenses</u>

   When it comes to general deterrence, certainty of punishment is more important than severity of punishment.  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 30 (2006).  Increases in the severity of punishment seldom, if ever, prevent crime.  *Id*. at 29; also see, *United States v. Beiermann*, 599 F.Supp.2d 1087, 1103-1104 (N.D. Iowa 2009) (noting that while deterrence is a laudable goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of"); This is especially true in the case of child pornography offenses. *United States v. Kelly*, 868 F.Supp.2d 1202, 1207 (D.New Mex. 2012) ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children").

2.    Comparative case studies in child pornography

U.S. v. Timothy Paul Rapson (2021) – Virginia man was convicted of receiving and distributing over 76,000 child pornography images, including many of prepubescent children, using a peer-to-peer file sharing program. Rapson received a six year sentence and a term of 20 years of supervised release.

U.S. v. Paul Lawrence Vella (2014) – Northern District of California. Vella was convicted of possession of over 250,000 child pornography images, using a peer to-peer file sharing program. His collection – including numerous images and videos depicting the forcible rape of, and other sadistic violence against children – was one of the largest ever discovered in the Silicon Valley. Further, the National Center for Missing and Exploited Children identified 915 known child victims from his collection of child pornography. Vella received a 59-month sentence.

U.S. v. Hudson (2019) – Northern District of California. Hudson was convicted of possessing over 222,000 images, using a peer-to-peer file sharing program, including many involving sadistic violence. Hudson also had a prior state conviction for lewd and lascivious conduct with a minor under 14. The district court imposed a minimum 10-year sentence but opined that but for the application of §2252(b)(2), it would have imposed the 87-month sentence requested by the defense.

There are many more cases that may be cited here, wherein far more serious child pornography offenders than James received less severe sentences than what is

being argued for by the Government in this case.

### 3.   Plea discussions

The Government set forth its initial plea offer in November 2019. This offer was viewed as unduly harsh, first by the Federal Public Defender on the case and later, by defense counsel.

In an effort to obtain a better plea disposition, defense counsel presented relevant mitigation evidence and strenuously argued that more serious offenders often received less prison time than what was being offered in the present case. Initially, defense counsel presented these arguments in the interests of obtaining a "possession" offer; these attempts were repeatedly rebuffed and declined by the Government. Thereafter, the defense argued for a lower offense level (i.e., less prison time) and a receipt plea offer. These attempts were likewise declined by the Government.

It bears noting that the Government never substantively altered its initial plea offer of November 2019; from the commencement of the case, the Government's position was largely one of "take it or leave it", if politely communicated.

The defense raises this point if only to not have the failure to reach an earlier disposition held against James. Even for officers of the court, the child pornography guidelines may be jarring. For someone never before accused of a crime, they can be no less than shocking, even to the point of inducing extreme despondency. The Government's declining to exhibit any leniency may only heighten that sense. For

certain defendants, it may not be initially easy to come to terms with what the child

pornography guidelines portend for them.

### F. The Need for The Sentence Imposed To Protect The Public From Further Crimes Of The Defendant – 18 U.S.C. § 3553(A)(2)(C)

As delineated above, research has consistently concluded child

pornographers have extremely low rates of reoffending. Not only are recidivism

rates low, but there is little evidence of any direct impact of viewing child

pornography on the commission of contact sexual offenses.  Hamilton, M., *The*

*Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political*

*Rhetoric?* 22 Stan. L. & Pol'y Rev. 545, 580 (2011).

Other than this offense, James is a law-abiding citizen with no criminal

history. He suffers from several serious medical ailments. It is unlikely that he will

reoffend. True first offenders "are easily the most empirically identifiable group of

guideline federal offenders who are the least likely to re-offend."  U.S. Sentencing

Commission, *Recidivism and the "First Offender"* (2004) at 17.

### G. Post-Offense Rehabilitation Serves Best Serves the Offender and the Public

Post-offense rehabilitation is widely recognized as an appropriate mitigating

circumstance despite the fact that the guidelines were amended before *Booker* to

prohibit downward departures at re-sentencing for post-sentencing rehabilitative

efforts for crimes committed on or after November 1, 2000. *U.S. v. Stern*, 590 F. Supp.2d 945(N.D. Ohio, 2008).

James has consistently and adamantly maintained that he has no sexual interest in children and that his conduct was due to a combination of factors: the very difficult period of time in his life, his PTSD, depression and alcohol consumption. However, during the course of this difficult case, James has come to the realization that – irrespective of his insistence that his behavior was not rooted in pedophilia – he did, after all, engage in acts pertaining to child pornography and thus must learn to understand just *why* he did so. Certainly, there are likely clues in the many traumas and illnesses he has experienced in his life. As such, James has come to the inevitable conclusion that therapy and treatment are of paramount importance for his own, personal rehabilitation.

To that end, the defense has sought out numerous programs (primarily sexual offender courses) for James to enroll in during this case. But, unfortunately, challenges undermined those efforts. The Covid-19 pandemic cancelled virtually all in-person courses. And the terms of his probation, which prevent his use of a computer, made it impossible for James to engage in online courses. But James has repeated his interest and determination to seek treatment and a better understanding for his inexcusable behavior.  During the course of this case, and pursuant to the terms of his probation, James has been actively treated by a mental health provider.

He seeks to continue those efforts.  It may be noted that longer sentences may impair a defendant's rehabilitation *Gall v. U.S.*, 128 S.Ct. 586 (2007).

Moreover, the court may also consider the cost to taxpayers for lengthy incarceration of nonviolent offenders. *U.S. v. Chavez*, 230 F.3d 1089 (8th Cir. 2000).

### H.    Pertinent Policy Statements – 18 U.S.C. § 3553(a)(5)

As argued above, § 2G2.2 is a flawed Guideline. The Department of Justice, itself, has acknowledged the same. The Department likewise agreed with the U.S. Sentencing Commission that the two-level enhancement for use of a computer should be eliminated.  And that the numerical threshold for number of images possessed should be increased.[35]

## IV.    RESPONSE TO THE PRESENTENCE INVESTIGATION REPORT AND PROBATION LETTER

A review of the Probation Investigation Report ("PIR") suggests that the Probation Office has correctly calculated the sentencing guidelines. Title 18 U.S.C. § 2252A(a)(2)(A), (b)(1):

- Base Offense Level:        22 [U.S.S.G. § 2G2.2(a)(2)]

- Prepubescent Minor:      +2 [U.S.S.G. § 2G2.2(b)(2)]

---

[35] https://www.justice.gov/sites/default/files/criminal/legacy/2013/07/11/2013annual-letter-final-071113.pdf (last accessed July 26, 2021)

- James does not contest that he was in possession of images depicting prepubescent minors.

- Distribution                    +2 [USSG § 2G2.2(b)(3)(F)]

  - James argues that within the context of child pornography, the extent of his distribution was quite low. Additionally, James was involved in a file sharing network that included items other than child pornography, too (e.g., music, files, photos, etc.). James never posted the material on any website for viewing.

- Sadistic/Masochistic:          +4 [U.S.S.G. § 2G2.2(b)(4)]

  - The defendant does not contest that he was in possession of images depicting Sadistic/Masochistic behavior. However, some of the pornography was obtained in an indiscriminate ("bulk") manner that wound up "drag-netting" various file types, and images. Additionally, the file sharing peer-to-peer networks include the sharing of all types of materials, some known, and some unknown. They likewise include materials for which one may not be seeking. The particular two videos delineated in the report (*see* P.I.R. p. 10, ¶ 46) are one of 700 images and 200 videos alleged. Although this does not excuse the Defendant's behavior, and conduct, it over-represents the defendant's wrongdoing.

- <u>Use of a Computer</u>:           +2 [U.S.S.G. § 2G2.2(b)(6)]

  - Defendant does not contest the use of a computer enhancement in the sexual exploitation of children.

- <u>600 or More Images</u>           +5 [U.S.S.G. § 2G2.2(b)(7)]

  - The defendant does not contest that he was in possession of more than 600 images. Much of these images came as a result of bulk images obtained, which over-represents defendant's wrongdoing.

- <u>Acceptance of Responsibility</u>        -3 [U.S.S.G. § 3E1.1(a)]

  - James has taken responsibility for his actions. In addition, a one-level reduction applies upon the motion of the Government for timely notification of his intention to enter a guilty plea, per USSG §3E1.1(a).

  <u>Total Offense Level Per Plea</u>:        34        (151-188 Months)

## V.    SUGGESTED SENTENCE

As stated above, per *U.S. v. Howe*, 543 F.3d 128 (3d Cir. 2008); *U.S. v. Pauley*, 511 F. 3d 468(4th Cir. 2007), James has exhibited extreme remorse over his behavior and the damage it has done to others. But James should not be defined just by this case. He has been a hardworking, selfless, and faced and often overcome difficulties in his life. James has also recognized the full extent of his errors, has exhibited strong interest in mental health counseling in order to rectify his mistakes and to become a productive member of society again.

Given the details and background of this case, and James' history and health,

the defense initially fought for a "possession" plea agreement because the it felt that a mandatory minimum sentence would be too harsh in this case and not consistent with 18 U.S.C. § 3553(a) factors.

Obviously, in light of the plea agreement, this case now necessities a mandatory minimum sentence. And although the sentencing guideline calculation by the U.S. Probation Office is accurate, nonetheless, in the defense's humble opinion, the maximum sufficient sentence that would accomplish deterrence, protection of the public, and provide correctional treatment in the most effective manner is a sentence of 60 months (Offense Level 25) imprisonment followed by 5 years of supervised release. This would be accomplished via the departure, variance and policy disagreement arguments set forth in this memorandum; it would be a sentence "sufficient but not greater than necessary" per *Kimbrough v. U.S.,* 128 S. Ct. 558, 564 (2007).

Finally, James has already suffered tremendously as a result of this case. As noted above, his life is all but destroyed now. Certainly, these were consequences of his own actions. But the court should consider just how much more punishment a person deserves for what is, after all, a nonviolent offense.

## IV.      CONCLUSION

For the reasons set forth above, we respectfully contend that the requested sentence is just and appropriate.

TABIBNIA LAW FIRM

By:      /s/ *Shahrooz C. Tabibnia*
Shahrooz C. Tabibnia
Attorney for Defendant
James Davolt