TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
AMY E. POMERANTZ (Cal. Bar No. 275691)
Assistant United States Attorney
Violent & Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0730
     Facsimile: (213) 894-0141
     E-mail:    amy.pomerantz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-515-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT JAMES DAVOLT |
| v. | |
| JAMES DAVOLT, aka "tarsier67@yahoo.com," aka "sepai35@yahoo.com," | Hearing Date: 08/16/21<br>Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the Hon. Virginia A. Phillips |
| Defendant. | [Victim Impact Statement Filed Concurrently Under Seal] |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Amy E. Pomerantz, hereby files its Sentencing Position for Defendant James Davolt.

//

//

//

This submission is based upon the attached memorandum of points and authorities, the Pre-Sentence Investigation Report ("PSR"), the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 2, 2021          Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

　　/s/　*Amy E. Pomerantz*
AMY E. POMERANTZ
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Over the course of several years, Defendant James Davolt distributed and received child sex abuse material through his Yahoo! email, thereby promoting and normalizing the sexual abuse of young children. Review of defendant's computers and the two Yahoo! email accounts uncovered approximately 738 images and 204 videos depicting child pornography, including videos involving the sexual abuse of toddlers and infants. In addition to the images and videos, FBI agents recovered a large number of captured Yahoo! chat messages dating back to 2009, in which defendant chatted with women in the Philippines. In these Yahoo! chat conversations, defendant not only explicitly requested child pornography videos, but also directed the sexual exploitation of children via webcam. Even more troubling, defendant bragged about how he previously had sex with children while visiting the Philippines (which defendant, in fact, traveled to on 12-13 occasions) and made plans to have sex with children in an upcoming visit.

Based on the facts of this case and consistent with the plea agreement, the government recommends a custodial sentence of 180 months, 25 years of supervised release, special assessments of $5,200 total, and restitution in an amount to be determined.[1]

**II. DEFENDANT'S CONDUCT**

On June 4, 2021, four days before trial, defendant James Davolt ("defendant") pleaded guilty to Counts Two and Five of the indictment

---

[1] One victim has come forward and requested $5,000 in restitution. However, government counsel is attempting to reach a stipulation with defense counsel that would obviate the need for further proceedings.

1 in United States v. James Davolt, CR No. 19-00515-VAP, which charged
2 defendant with Receipt and Distribution of Child Pornography, in
3 violation of 18 U.S.C. § 2252A(a)(2)(A), (b)(1).
4     As set forth in the plea agreement, defendant admitted the
5 following facts:
6     On or about July 3, 2013, February 9, 2015, February 12, 2015,
7 and February 26, 2015, in San Luis Obispo County, within the Central
8 District of California, and elsewhere, defendant knowingly
9 distributed and received child pornography, as defined in Title 18,
10 United States Code, Section 2256(8)(A), via emails that had been
11 mailed, and using any means and facility of interstate and foreign
12 commerce, had been shipped and transported in and affecting
13 interstate and foreign commerce by any means, including by computer,
14 knowing that the videos and images contained visual depictions of
15 minors engaged in sexually explicit conduct, and knowing that videos
16 and images depicted real children.
17     For example, defendant distributed and/or received the following
18 videos:
19 - "sexyslave2.m4v.mpg."  This video file is 3:00 minutes long
20   and depicts a prepubescent girl bound at the wrist and
21   wearing a leash, who is penetrated by an adult male penis
22   and possibly a sex toy.
23 - "gracel video fuckHARD.mpg"  This is a 33 second video that
24   begins with a prepubescent female child lying on her back
25   with her vagina clearly exposed. An adult male then
26   penetrates her vagina with his penis.
27 - "pthc-jho-loifuck-10yokatrina
28   doggystile_new2007_2_.wmv.flv."  This is a 29-second video

1            that depicts an adult male penetrating a prepubescent
2            female child's anus and/or vagina from behind.

3     Defendant also used Yahoo! chat messenger to direct individuals
4 in the sexual exploitation of children via webcam. For instance, on
5 or about on May 19, 2014, defendant, using his "tarsier67@yahoo.com"
6 account, sent messages to "moma.sexyhot@yahoo.com," directing her to
7 "show the 12 year," "have her stand and pull down shorts," "have her
8 stand close to cam," "show her sitting and open legs," and "have her
9 open her pussy."

10     Additionally, on or about September 3, 2015, a federal search
11 warrant was executed at defendant's home in Templeton, California.
12 At that time, defendant knowingly possessed on his laptop computers
13 hundreds of images and videos containing child pornography. Some of
14 the images depicted children under the age of two years being used
15 for sexual acts. Other images portrayed sadistic or masochistic
16 sexual conduct involving minor children. In total, defendant
17 possessed over 700 images and 200 videos containing child
18 pornography, including images and videos depicting children under the
19 age of twelve.

20     Defendant admits and agrees that the children depicted in the
21 child pornography images and videos are real children, and defendant
22 downloaded the images and videos from the Internet, which is a means
23 and facility of interstate and foreign commerce, using a computer and
24 interactive computer service (Yahoo! email).

25 **III. GUIDELINES CALCULATION**

26     The parties agreed, as did the USPO, that the following

27
28

constitutes the appropriate Guidelines calculation (Plea Agreement at ¶ 16; PSR at 3; PSR ¶¶ 41-52.)

| | | |
|---|---|---|
| Base Offense Level: | 22 | U.S.S.G. § 2G2.2(a)(2) |
| Prepubescent Minor | +2 | U.S.S.G. § 2G2.2(b)(2) |
| Distribution: | +2 | U.S.S.G. § 2G2.2 (b)(3)(F) |
| Sadistic Material/Infant & Toddler Exploitation | +4 | U.S.S.G. § 2G2.2(b)(4) |
| Use of a Computer | +2 | U.S.S.G. § 2G2.2(b)(6) |
| 600+ Images | +5 | U.S.S.G. § 2G2.2(b)(7)(D) |

Based on the above calculations, and applying a three-level decrease in acceptance of responsibility, the total offense level is 34. Coupled with a Criminal History Category I (PSR ¶¶ 57-63), with which the government concurs, the Guidelines range is 151 to 188 months.

**IV. GOVERNMENT'S RECOMMENDATION**

Based on the facts of this case, the government recommends a Guidelines-range sentence of 180 months, 25 years of supervised release, special assessments of $5,200 total, and restitution in an amount to be determined.

    **A.    A 180-Month Sentence is Sufficient but not Greater than Necessary**

        1.    <u>Nature and Circumstances of the Offense</u>

The receipt and distribution of child pornography is not a victimless crime. It "is intrinsically related to the sexual abuse of children" because "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." <u>New York v. Ferber</u>, 458 U.S. 747, 759 (1982); <u>see also</u> United States

Sentencing Comm'n, Federal Child Pornography Offenses (Dec. 2012), at vi (noting that all child pornography offenses, including possession, are "extremely serious because they both result in perpetual harm to victims and validate and normalize the sexual exploitation of children"). The images leave a "permanent record of the children's participation[,] and the harm to the child is exacerbated by their circulation." Ferber, 458 U.S. at 759. Consumers of child pornography -- like defendant -- "directly contribute" to the children's continuing victimization and help create a market for the abuse of children "by providing an economic motive for creating and distributing the materials." See United States v. Goff, 501 F.3d 250, 260 (3rd Cir. 2007); United States v. Daniels, 541 F.3d 915, 924 (9th Cir. 2008) ("merely possessing child pornography is not a victimless crime; it fuels the demand for the creation and distribution of child pornography"); United States v. Yuknavich, 419 F.3d 1302, 1309 (11th Cir. 2005) ("A child somewhere was used to produce the images downloaded by [defendant], in large part, because individuals like [defendant] exist to download the images.").

This harm is corroborated by one of the real victims in this case, whose victim impact statement is filed under seal. This statement shows the need for the government's recommended sentence. This victim's mother shared a small glimpse, excerpted below, into the horrific experiences of her daughter's sexual abuse and its effects, which defendant perpetuated through his conduct in this case. She writes that the "fear consumes her [daughter] daily," that her daughter is "full of anxiety," "embarrassed and humiliated," and that she has "prolonged major trauma that will mess with her mind for the rest of her life." (Victim Impact Statement, Government Exhibit

5

"B.") The victim's mother writes that she herself is "overcome with grief; I feel dead" and explains how the entire family has suffered. In a separate addendum to her statement, the victim's mother writes: "I've been dealing with a little girl who talks daily about not wanting to exist anymore. A little girl whose pain is so great and who feels so hopeless and angry that she talks openly about wanting to kill herself." (Id.) The pain and grief evident in this victim impact statement is doubtless felt by the other children whose sexual abuse was depicted in the videos defendant sent, received, and possessed, as well as felt by the child victims of women with whom defendant chatted online, who were forced to engage in sex acts on camera and in real life to satisfy the pedophilic desires of men like defendant.

As the USPO noted in its recommendation letter, defendant's online communications were "of significant concern and seen as aggravating." (Recommendation Letter at 6.) Defendant actively traded child sex abuse material through his Yahoo! email accounts and engaged in numerous conversations about his sexual desire for young, pre-pubescent children. For instance, in a chat dated September 19, 2014, defendant offered payment for videos of young Asian girls with older white men ("must be very young with old man . . ."), and clarified that he wanted girls aged "like 8 or 9 or 10 or 11 or 12." (Id. at 11.) He bragged that he had "over 300" videos and demanded to be sent videos that he had not seen before. (Id. at 14-15.)

Moreover, there is no dispute that defendant actively directed the sexual exploitation of children via webcam. For instance, he told one chat partner to "show the 12 year," "have her stand and pull down shorts," "have her stand close to cam," and "have her open her

6

pussy." In so doing, defendant not only encouraged and normalized the sexual abuse of children, but generated demand for women to sexually abuse their own children (or children in their care) for the sake of tips.

Perhaps even more disturbing, in numerous chat messages defendant casually discussed raping children while in the Philippines. (See Govt. Exh. A at 2 ("i have fuck so many young in the philippines, i like it so much"); id. at 7 ("yes i fucked a 6 year last year in philippines.")) Defendant also attempted to arrange to have sex with children during upcoming visits. In one chat, for instance, defendant advised that he was planning a trip to the Philippines in April and said: "I am goingn (sic) to be fucking some kids and paying them money" and that he would be "busy making sex videos" as well. In other chats, defendant offered to pay money in order to have sex with young girls while in the Philippines and solicited sex with a child as young as six years of age. (Govt. Exh. A at 3.) While the government cannot confirm that defendant did in fact sexually abuse children during his admitted 12-13 visits to the Philippines, he clearly had both the desire and the access.[2] Defendant's casual, matter-of-fact tone in describing his past sexual

---

[2] While the government does not intend to respond in full to defendant's sentencing position, defendant's blanket denial of the existence of child sex tourism in the Philippines merits a response. (Def. Br. at 7.) Citing a book published twenty years ago, defendant asserts that there is "no empirical evidence of child prostitutes in the Philippines under the age of 13." (Id. at 18-19.) Yet defendant's own chats prove this position wrong and almost offensively naïve; child sex abuse most certainly exists in the Philippines, just as it tragically occurs in every other country. The fact that victims are minors -- and, as evidenced by the chats in this case, often under the guardianship of adults who exploit them for money -- is an obvious reason why "empirical evidence" may have been lacking twenty years ago when defendant's source was published.

abuse of children is deeply disturbing and belies his later claim that this was "just fantasy." (USPO Recommendation Letter at 6.) But regardless of whether defendant was telling the truth about his prior sexual abuse of children, his willingness and excitement in conversing about such abhorrent acts -- even if mere puffery -- are still illuminating as to his desires, nature, and characteristics, and should be considered at sentencing.

In sum, defendant was not just distributing or receiving pornography; he actively engaged in distribution, receipt, and discussion -- for his own sexual gratification at the expense of innocent children who will undoubtedly suffer prolonged trauma as a result of their abuse. In light of these facts, a substantial sentence is necessary to achieve just punishment and to reflect the seriousness of the offense under § 3553(a)(2)(A).

**B.   Defendant's History and Characteristics**

On balance, the government's recommended sentence is high enough to account for the many aggravating factors on this record. Yet, a Guidelines-range sentence also considers mitigation referenced by the PSR, in particular, defendant's acceptance of responsibility, his upbringing, and his own alleged victimization. (PSR ¶¶ 69-74.) A Guidelines-range sentence incorporating a reduction for acceptance of responsibility and dismissal of other counts achieves the proper balance of aggravating and mitigating factors. The government believes that an 8-month deduction from the high-end sentence of 188 is a fair and appropriate balance. Defendant does not appear to have suffered such hardship that a significant downward departure is justified. Nor can one incident in 2012 during which defendant apparently suffered head trauma, which ultimately resulted in a

diagnosis of PTSD, excuse away his pedophilic behavior. Such an argument is untethered to reality and diminishes the plight of those who suffer from PTSD.

### C. A 25-year Period of Supervised Release is Sufficient but Not Greater than Necessary

The government agrees with the recommendation of the USPO and recommends a 25-year period of supervised release to protect the public. As set forth in the plea agreement, defendant agreed to not oppose the USPO's recommended conditions of supervised release, including registration as a sex offender, counseling, access to sexual materials, restricted contact with minors, maintain pre-approved employment, restrictions on where hen reside, search conditions, and disclosed computer access. (Plea Agreement ¶ 2.)

It is imperative that when defendant is released from custody, he be put in a position to succeed and refrain from revictimizing children -- either online or in person. A 25-year term of supervised release will accomplish this important goal.

### D. Special Assessments

In addition to the $200 special assessment that should be imposed pursuant to 18 U.S.C. § 3013, defendant is also subject to a mandatory special assessment of $5,000 pursuant to the Justice for Victims of Trafficking Act of 2015, to the extent he is deemed a nonindigent person (Plea Agreement ¶¶ 2, 10).

To the extent that the PSR concludes that defendant does not have the ability to pay a fine or the special assessment under 18 U.S.C. § 3013 (PSR ¶ 101), defense counsel has indicated that he may be receiving money as part of a retirement package. See also PSR ¶¶ 114-115. Defendant could also still be gainfully employed upon

release.  Therefore, the government objects to the USPO's finding that defendant is unable to pay the special assessments.[3]  See, e.g., United States v. Kelley, 861 F.3d 790, 802 (8th Cir. 2017) (affirming application of $5,000 special assessment pursuant to § 3014 where "Kelley would, at some point, be able to pay the special assessment" despite defendant's "negative net worth" at the time of sentencing); United States v. Janatsch, 2018 WL 566297, at *3-4 (10th Cir. Jan. 26, 2018) (affirming application of $5,000 special assessment where defendant was "going to have plenty of time to pay that off while incarcerated"); United States v. Strange, 692 Fed. Appx. 346, 349 (9th Cir. 2017) (finding application of $5,000 special assessment, payable in $150 installments starting 60 days after judgment, was "reasonable in light of the language of the statute and Campos's circumstances") (citing United States v. Orlando, 553 F.3d 1235, 1240 (9th Cir. 2009) ("The defendant bears the burden of proving he is unable to pay the fine . . . However, the court may fine a currently indigent defendant, if it finds that he has earning capacity to pay the fine in the future.")).  Moreover, the imposition of this special assessment impresses upon defendant the seriousness of the offense, as well as afford additional deterrence in the form of regular payments.

**E.   Restitution**

Lastly, as noted by the USPO, 18 U.S.C. § 2259 prescribes mandatory victim restitution for defendant's crime of conviction (as

---

[3] It is also notable that defendant privately retained counsel.

10

does U.S.S.G. § 5E1.1), which defendant agreed to pay.  (Plea Agreement ¶ 9.)  The parties are in the process of negotiating a restitution agreement.  In the event the parties are unable to reach an agreement, the government requests that the Court set a hearing 60 days from the sentencing hearing to resolve the matter of restitution.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 180 months' imprisonment followed by 25 years of supervised release and payment of a $5,200 assessment, and restitution in an amount to be subsequently determined.